J-S59032-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| ISHAQ IBRAHIM | |
| Appellant | No. 1150 EDA 2015 |

Appeal from the Judgment of Sentence March 26, 2015
in the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0005642-2013

BEFORE: BENDER, P.J.E., OLSON, J., and FITZGERALD,[*] J.

MEMORANDUM BY FITZGERALD, J.:        **FILED JANUARY 25, 2017**

Appellant, Ishaq Ibrahim, appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas after the trial court found him guilty of, *inter alia*, four counts of robbery at a nonjury trial.[1] Appellant claims the trial court erred by (1) appointing standby counsel to represent him at trial and denying counsel's motion for a continuance, (2) admitting the conclusions of a forensic biologist regarding DNA evidence, and (3) failing to merge several counts of robbery. Additionally, Appellant challenges the discretionary aspects of his sentence, asserting the court (1) erred in applying the deadly weapons enhancement of the Sentencing Guidelines, (2) imposed a sentence disproportionate to his codefendants, his prior record, and his involvement in the crimes, and (3)

---

[*] Former Justice specially assigned to the Superior Court.

[1] *See* 18 Pa.C.S. § 3701(a)(ii), (vi).

impermissibly punished his political beliefs as a "sovereign citizen."[2]   We affirm.

On June 19, 2013, at approximately 2:50 p.m., two individuals entered the National Penn Bank in Lower Pottsgrove and brandished weapons, which appeared to be revolvers.   One of the individuals, later identified as codefendant Wesley Davis, was wearing a camouflage hat, sunglasses, a dark rugby shirt, dark pants, tan boots, and a blue bandana covering the lower part of his face.   The other individual, alleged to be Appellant, was dressed in a black baseball cap, sunglasses, a white button-down shirt, blue jeans, grey sneakers, and a leopard print scarf covering the lower part of his face.

---

[2] A tenet of the sovereign citizen theory is that

> when a person is born, that person's birth certificate (or Social Security card application) creates a corresponding legal fiction, or "strawman," in that person's name.[ ]  This means that every person has a kind of dual personality; there is the "flesh-and-blood" person on one hand and the fictional strawman on the other.[ ] . . .  [T]hey believe that only the strawman really operates in the modern commercial world (engaging in transactions, collecting debts, and contracting with others); accordingly, they believe the government has power over the strawman only, and completely lacks authority over the flesh-and-blood person.[ ]

Joshua P. Weir, Sovereign Citizens: A Reasoned Response to the Madness, 19 Lewis & Clark L. Rev. 829 (2015).

During the robbery, Davis, the individual in the blue bandana, stood in the lobby and pointed his weapon at one of the tellers, Jean Gresko, who was at a desk making phone calls. The individual in the leopard print scarf, allegedly Appellant, pointed his weapon at the teller behind the counter, Ashley McHone. The individual in the leopard print scarf jumped over the counter, ordered McHone to open the drawers, placed the weapon against her side, took the money from the drawers, and placed it into a bag.

As the two individuals were leaving, a customer, Charles Fulmer, entered the bank carrying two bags of coins. The individual in the blue bandana pointed his weapon at Fulmer and ordered Fulmer to get on the ground. Each robber picked up a bag of Fulmer's coins as they left the bank. The robbers fled in a silver sedan with an out-of-state license plate. Bank personnel alerted police, as did the occupants of a nearby business.

Approximately ten minutes after the robbery, a police officer on Route 422 observed a vehicle that was occupied by three individuals and that matched the description of the vehicle leaving the scene of the robbery. A vehicle chase ensued on Route 76 and onto Route 320. Police officers momentarily lost sight of the vehicle after it turned into a side street, but they backtracked and discovered the vehicle abandoned in the cul-de-sac shortly thereafter. All four doors and the trunk of the car were left open.

Appellant, Davis, and a third codefendant, James Byrd, were apprehended on or near the grounds of the Haas Estate shortly thereafter.

Davis indicated that a fourth individual was on the property. That same day, police officers recovered a bag containing the shirts, blue bandana, and leopard print scarf worn by the robbers, as well as a bag containing coins and a bag containing U.S. currency. Police officers placed all of the clothing into a single bag and then hung the items in a garage to dry before conducting forensic testing. A fourth individual was not found.

The following day, a semiautomatic pistol was found near the site of the defendants' arrest. Five months later, in November, groundskeepers at the Haas Estate found a revolver and reported it to police. The revolver was loaded but rusted, and the cylinder was inoperable.

Testing revealed that Appellant could not be excluded as a contributor to DNA on the leopard print scarf. Additionally, at the time of his arrest, Appellant was wearing bright orange underwear, which was consistent with the bank's surveillance camera images of the robber who jumped over the counter and later bent over to pick up a bag of Fulmer's coins. Lastly, at the time of his arrest, Appellant was wearing blue jeans and grey sneakers that matched the images of pants and shoes the robber was wearing inside the bank.

Appellant was charged with ninety-nine offenses, and his bail was set at $1,000,000. Appellant initially proceeded with privately retained counsel. In February 2014, the Public Defender's Office entered its appearance, and

the court granted private counsel leave to withdraw. On July 8, 2014, the trial court filed a letter from Appellant "firing" the Public Defender.

On July 10, 2014, the trial court, with the Honorable William J. Furber presiding, convened a hearing. Appellant insisted on proceeding *pro se* and raised sovereign citizen claims challenging, *inter alia*, (1) the propriety of the charging documents because they allegedly misspelled his name by using all capital letters, (2) the jurisdiction of the court, and (3) the competence of the court and Commonwealth to proceed without taking an oath and affirmation. The court denied Appellant's motions and reminded Appellant that it would give Appellant an opportunity to assert his right to proceed *pro se*, but that Appellant did not have a right to disrupt the proceedings. N.T., 7/10/14, at 16.

The court questioned the public defender, Heidi Kranzel, Esq., regarding her representation of Appellant to date. Attorney Kranzel stated that she entered her appearance on behalf of Appellant in February 2014, after private counsel withdrew. According to Attorney Kranzel, one week earlier, Appellant advised her that he "no longer want[ed] her services." *Id.*, at 28-29. When asked about her preparation for trial, Attorney Kranzel replied that she reviewed the discovery, prepared pretrial motions, met with Appellant, had numerous phone conversations with him, and conducted an independent investigation. *Id.* at 30. Attorney Kranzel asserted she was prepared to try the case but for Appellant's desire not to be represented by

counsel and a scheduling conflict with the anticipated trial date. *Id.* The court granted Appellant leave to proceed *pro se*.

On July 14, 2014, the trial court convened a hearing. Appellant appeared with Carol Ann Sweeney, Esq., acting as standby counsel. The court granted the codefendants' motions to sever their cases from Appellant's case. Additionally, the court granted the Commonwealth leave to amend the information against Appellant to reduce the number of charges and remove language triggering a mandatory minimum sentence. The court indicated that Appellant would not be entitled to discharge under Pa.R.Crim.P. 600 and denied his *pro se* motions based on the Uniform Commercial Code, admiralty law, and common law. The court reserved ruling on a suppression claim challenging the validity of a search warrant to obtain Appellant's DNA.

Appellant moved for a reduction of bail because of the reduced number of charges in the amended information and the amount hampered the preparation of his defense. N.T., 7/14/14, at 71-72. On the latter point, Appellant noted that he did not have an opportunity to access the law library. *Id.* at 72. Appellant requested that bail be set at $99,000 to permit him access to the prison population and the library. *Id.* at 75.

The trial court denied the motion to reduce bail. *Id.* However, the court directed standby counsel to discuss Appellant's access to the law library with prison officials and advise the court as to a possible remedy. *Id.*

The court granted Appellant a continuance for trial preparation. A separate order granting Appellant access to the law library was not issued.

During the continuance, Appellant filed numerous *pro se* motions but did not complain of a lack of access to the law library or an investigator. Appellant appeared *pro se* at a pretrial hearing on January 12, 2015, with Attorney Kranzel as standby counsel. The trial court denied Appellant's *pro se* pretrial motions, which again challenged the trial court's jurisdiction, the Commonwealth's competence to prosecute him, the court's ability to hear the case without taking an oath, and the validity of the charges against an alleged corporate entity. N.T., 1/12/15, at 63-93. The court also heard arguments on Appellant's motion to suppress and ruled that the warrant to obtain a DNA sample from Appellant was valid.

Appellant averred that he did not have access to the prison library and that prison officials failed to honor a prior ruling by the court. *Id.* at 95. Appellant also asserted the bail amount was an attempt to hamper his defense. *Id.* at 107. Attorney Kranzel suggested that Appellant did not have physical access to the library due to the amount of his bail, but could request legal materials and have them brought to his cell. *Id.* at 110. The trial court determined there was no prior order granting Appellant physical access to the library. The court, however, entered an order granting Appellant access to the library during trial. Appellant continued to assert he

was unprepared for trial, but the court directed that a jury be selected. Appellant objected, claiming he did not consent to a jury trial.

The trial court declared a short recess, after which the court indicated that Appellant signed a form waiving his right to a jury trial. Appellant continually interrupted the court's attempts to conduct a colloquy. When asked standard yes-or-no questions during this colloquy, Appellant responded that he did not want a jury. The trial court determined Appellant waived his right to a jury trial.

The following day, January 13, 2015, the court convened for the first day of trial, and Appellant appeared with Benjamin Cooper, Esq., and Attorney Kranzel as standby counsel. Appellant again challenged the court's jurisdiction. N.T., 1/13/15, at 6-8. He asserted that with the opportunity to access the library the previous night, he discovered federal regulations supporting his jurisdiction claims. The court directed the Commonwealth to call its first witness, but Appellant interrupted. The court reminded Appellant that it denied his jurisdictional claims and instructed him that further outbursts would result in the appointment of standby counsel to act as his counsel. The court called a recess in an attempt to calm the proceedings.

Following the recess, Appellant continued to interrupt the trial court's explanation of the rules of decorum. The court again directed the

Commonwealth to call its first witness, at which time Appellant objected, and the following exchange occurred:

> THE COURT: If you disrupt me again, I will appoint the Public Defenders.
>
> [Appellant]: Objection.  I do not accept your offer.  You do not have my permission.
>
> THE COURT: The Public Defenders are hereby appointed.  Mr. Cooper and Ms. Kranzel, you are hereby ordered to represent [Appellant].  If you disrupt me, I will remove you to Video Room 2.
>
> [Appellant]: You do not have the permission, any authority over me.
>
> THE COURT: If you disrupt this courtroom again—
>
> [Appellant]: Objection.  I do not agree to your offer. Objection.

N.T., 1/13/15, at 19.  The trial court ordered Appellant's removal from the courtroom.

Following a brief recess, the trial court reconvened, at which time Appellant's counsel requested a continuance.  *Id.* at 20-21.  Counsel indicated that they did not have contact with Appellant for several months to prepare a defense strategy, review witness testimony, or discuss whether Appellant intended to testify.  *Id.* at 21.  The court denied counsel's request for a continuance and reasoned that the facts of the case were relatively straightforward, both counsel were both seasoned litigators, and counsel would have time to prepare during what was expected to be a four-day trial.  *Id.* at 21-23.

Trial commenced that same day. The two tellers, McHone and Gresko, as well as the customer with the bags of coins, Fulmer, testified regarding the robbery. Numerous police officer testified about the vehicle chase, the apprehension of Appellant and the codefendants, and the collection, storage, and processing of the physical evidence, including the leopard print scarf worn by one of the robbers.

Jennifer Sears, a forensic biologist with NMS Labs, was qualified as an expert in forensic biology and the analysis of DNA by stipulation. Sears tested numerous samples for DNA and authored several reports, which were admitted into evidence over Appellant's counsel's objection that the Commonwealth failed to establish a proper chain of custody of the items tested. Sears testified she tested a sample of Appellant's DNA and the DNA taken from the leopard print scarf and concluded "the probability of selecting an unrelated individual from random from the general population with the same alleles as the major source of this profile" was "one in over one trillion, two hundred and forty-nine billion U.S. African Americans." N.T., 1/14/15, at 179.

On cross-examination, Sears testified that she generated the probability statistics using an in-house program developed and validated by NMS. Although other organizations did not use the program, it was previously used in court and subject to audits. *Id.* at 186-87. Sears described the program as "a pretty straightforward Excel-based program

- 10 -

basically that is just used to take statistical calculations and perform the mathematics behind them for you so you don't have to do them out by hand." *Id.* at 187.

The defense called one witness, codefendant Wesley Davis,[3] who testified that Appellant was not involved in the robbery. *Id.* at 213. On cross-examination, the Commonwealth asked who the other robber was, and Davis testified, "That's Ish—that's my man that got away." *Id.* at 220. Davis denied that he was beginning to say "Ishaq" and testified the other robber was "Mark Block," who Davis called "Ish." *Id.* at 220, 223.

On January 15, 2015, the trial court found Appellant guilty of three counts of robbery—fear of serious bodily injury relating to McHone, Gresko, and Fulmer, and one count each of robbery—demanding money from a financial institution, criminal conspiracy to commit robbery—fear of serious bodily injury, and criminal conspiracy to commit robbery—demanding money from a financial institution. The court acquitted Appellant of six additional charges of robbery—fear of serious bodily injury regarding six other individuals in the bank who did not testify at trial.

On March 25, 2015, the trial court sentenced Appellant to the following terms of imprisonment: (1) five to ten years for robbery—fear of serious bodily injury involving McHone; (2) a consecutive five to ten years for

---

[3] By the time of Appellant's trial, Davis already pleaded guilty to robbery and conspiracy. Davis, during his testimony at Appellant's trial, wavered when answering whether he possessed a real or a toy firearm during the robbery.

robbery—fear of serious bodily injury involving Gresko; (3) a consecutive four to eight years for robbery—fear of serious bodily injury involving Fulmer; (4) a concurrent one to two years for the conspiracy to commit robbery—fear of serious bodily injury; and (5) a concurrent one to two years for robbery—demanding money from a financial institution. The court merged the second count of conspiracy to commit robbery. The resulting aggregate sentence was fourteen to twenty-eight years' imprisonment. Although the trial court suggested Appellant was *pro se* for the purposes of the sentencing hearing, Attorney Kranzel was present and successfully reduced Appellant's prior record score from two to one and presented arguments on his behalf before allocution. Neither Attorney Kranzel nor Appellant objected to the use of the deadly weapons enhancement to determine the suggested standard minimum sentence range.

Appellant's counsel filed a timely post-sentence motion, asserting that the sentence was excessive based on his codefendants' sentences and his involvement in the crimes. Counsel noted that codefendant Davis, the other robber, was sentenced to four to ten years' imprisonment, with a consecutive eight years' probation, and Byrd, who was in the vehicle during the chase, was sentenced to eleven to twenty-two years imprisonment. Post Sentence Mot. for Recons., 3/13/15, at 2. On April 1, 2015, the trial court formally appointed the Public Defender to represent Appellant, and denied the counseled post-sentence motion on April 3, 2015.

On April 9, 2015, the trial court received and filed Appellant's *pro se* notice of appeal.[4] On April 20, 2015, the court filed Appellant's *pro se* post-sentence motion, which was hand-dated April 5, 2015, and sent in an enveloped postmarked April 9, 2015.[5]

On April 22, 2015, counsel filed a timely notice of appeal. The trial court ordered a Pa.R.A.P. 1925(b) statement, and counsel timely filed a statement challenging the discretionary aspects of Appellant's sentence. The court prepared a responsive opinion. This Court remanded this matter for the filing of a supplemental Rule 1925(b) statement to include the issues raised in Appellant's "hybrid" *pro se* post-sentence motion, and the trial court submitted a supplemental opinion.

Appellant presents the following questions, which we reorder for review:

> The trial court erred in refusing to give the Defenders Office of Montgomery County time to prepare for trial, confer with the defendant and the witnesses and prepare to litigate the matter and the various motions pertinent to the case. The Trial court erred in forcing Appellant to trial even though Appellant was never allowed to go to the law library to prepare his case as had been ordered by a judge of coordinate jurisdiction. Finally, the Trial Court erred in failing to provide Appellant with resources needed to defend himself *i.e.*, no money to make phone calls with or

---

[4] The *pro se* notice of appeal was sent in an envelope postmarked March 30, 2015.

[5] Appellant also filed a second *pro se* notice of appeal, which this Court received on May, 1, 2015.

to hire an investigator. Appellant had no assets, income or resources.

The trial court erred in admitting the DNA reports into evidence. The trial court erred in overruling the objections to the DNA reports and to the conclusions of the expert. The trial court also erred in admitting the supplemental report where the program used by the expert for the purposes of testimony and completion of the report had no scientific validity.

Appellant also asserts that charges should have merged for sentencing purposes, i.e., the substantive robbery charges of Fulmer, McHone and Gresko should have merged for sentencing purposes with the one substantive count of robbing a financial institution.

Appellant asserts that the trial court erred in applying the deadly weapon enhancement three times at his sentencing for each complainant and should only have been employed once.

Appellant challenges the discretionary aspects of the sentence. The sentence imposed was harsh and excessive, in view of the defendant's lack of a significant criminal history. Appellant's co-defendants received significantly lesser sentences. Therefore, [Appellant] contends his sentence was unduly harsh and excessive when compared to the other defendants and their roles in the offense. [Appellant] contends he was sentenced excessively for his political views expressed throughout these proceedings of being a sovereign citizen.

Appellant's Brief at 8.

Appellant first contends that the trial court erred in compelling him to proceed to trial with counsel despite his lack of physical access to the prison law library and without providing him resources to defend himself *pro se*. *Id.* at 29. He also argues that the court erred in appointing counsel when he raised good-faith objections to his lack of access of the law library and

other resources, the denial of his request to proceed *pro se*, and the appointment of counsel for trial. ***Id.*** at 25. Appellant maintains that the trial court issued a prior order directing that he have access to the prison law library. ***Id.*** at 25-26. Appellant further contends the denial of counsel's request for a continuance of trial constitutes an abuse of discretion because the court provided counsel inadequate time to "refamiliarize themselves with the case, do an investigation and prepare witnesses for court." ***Id.*** at 28. In sum, Appellant argues that the trial court's decisions to appoint standby counsel to represent him and denying counsel's motion for a continuance "failed to scrupulously protect Appellant's Sixth Amendment right to represent himself and his right to a fair trial." ***Id.*** at 30. No relief is due.

We review the denial of a request to proceed *pro se* and for continuance for an abuse of discretion. ***See Commonwealth v. El***, 977 A.2d 1158, 1165-67 (Pa. 2009); ***Commonwealth v. Sandusky***, 77 A.3d 663, 671 (Pa. Super. 2013). The Pennsylvania Supreme Court has recognized:

> Potentially disruptive defendants, like all defendants, have the right to represent themselves if counsel is validly waived. Whenever a defendant seeks to represent himself, and particularly when he may be disruptive, standby counsel should be appointed. The court should explain to the defendant the standards of conduct he will be expected to observe. If the defendant misbehaves, he should be warned that he will be removed from the court, his right to represent himself will be considered waived, and the trial will continue in his absence with standby counsel conducting the defense. If the defendant again misbehaves, these measures should be taken. The

defendant must be made to realize that his disruptive tactics will result only in his exclusion from the courtroom. His case will be tried according to law, in an attempt to do justice, whether he cooperates or not.

*Commonwealth v. Africa*, 353 A.2d 855, 864 (Pa. 1976) (footnotes omitted); *accord Commonwealth v. Abu-Jamal*, 720 A.2d 79, 109 (Pa. 1998).

As to requests for continuances, this Court has noted:

"[A] myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend . . . an empty formality." However, "[n]ot every restriction on . . . time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel."

*Sandusky*, 77 A.3d at 671.

We also find persuasive the following discussion of the United States Seventh Circuit Court of Appeals when affirming a trial court's decision to remove defendants from the courtroom for misconduct:

Our intention is not to quash the presentation of creative legal arguments or novel legal theories asserted in good faith. But the arguments raised by these defendants were not in good faith. We have repeatedly rejected their theories of individual sovereignty, immunity from prosecution, and their ilk. Regardless of an individual's claimed status of descent, be it as a "sovereign citizen," a "secured-party creditor," or a "flesh-and-blood human being," that person is not beyond the jurisdiction of the courts. These theories should be rejected summarily, however they are presented. These defendants raised their immunity arguments with the trial court, which properly dismissed them. **But for these defendants, once was not enough. Rather than acknowledging the court's ruling (and, if they wished, saving their arguments for appeal), these defendants continued**

- 16 -

> **to interrupt the proceedings in a campaign to obstruct the trial**. **In doing so, they crossed the line, entering the territory of abuse of the judicial process**.

*United States v. Benabe*, 654 F.3d 753, 767 (7th Cir. 2011) (citation omitted) (emphasis added).

As to Appellant's challenge to the decision of the court to appoint counsel for trial, the record supports the trial court's determination that Appellant's disruptive behavior was not a good-faith objection to the lack of access to the prison library. There was no order providing Appellant physical access to the prison library following the July 2014 hearings. Rather, after denying Appellant's *pro se* motions raising sovereign citizen claims, the court directed standby counsel to determine how to grant Appellant access to the law library. Appellant refused to cooperate with standby counsel. Moreover, although Appellant did not have physical access to the library, legal materials were delivered to his cell. Appellant continued to file numerous motions raising sovereign citizen claims throughout the continuance, but there is no indication in the record that he requested additional access to the law library or other resources until the day of trial.

Appellant appeared at the January 12, 2015 pretrial hearing and continued to raise variations on the sovereign citizen claims denied at the July 2014 hearing, and the trial court again denied his *pro se* motions. Appellant persisted on January 13, 2015, the first day of trial, and trial court took several measures to attempt to calm Appellant. The court warned

Appellant that additional disruptions would result in the appointment of counsel. The court attempted to explain the rules of conduct in the court, but Appellant continued to object. The court then appointed counsel.

Thus, our review reveals no abuse of discretion in the trial court's conclusion that Appellant was engaging in intentionally disruptive behavior following the repeated denials of his sovereign citizen claims. *Cf. Benabe*, 654 F.3d at 767. Similarly, the record belies Appellant's contention that he was merely advancing good-faith arguments to proceed *pro se*. Accordingly, no relief is due on Appellant's assertions that the trial court failed to scrupulously honor his right to proceed *pro se*. *See Commonwealth v. Africa*, 353 A.2d at 864; *accord Abu-Jamal*, 720 A.2d at 109.

As to counsel's request for a continuance, the record adequately supports the trial court's suggestion that further delay was unnecessary. As noted by the court, Attorney Kranzel asserted she was ready for trial on July 10, 2014. Counsel was appointed as standby counsel while Appellant proceeded *pro se*. The Commonwealth's allegations were relatively straightforward. Appellant's defense that there was a fourth person in the car who committed the robbery in the leopard print scarf was not complex and did not require extensive investigation or preparation. The facts that Wesley Davis initially indicated he was carrying a toy weapon and the Commonwealth effectively cross-examined him do not evince Appellant's counsel's lack of preparation or an opportunity to prepare. In light of the

foregoing, we discern no basis to reverse the trial court's denial of Appellant's counsel's request for a continuance.

Appellant next contends the trial court erred in admitting into evidence the DNA report and Jennifer Sears' expert opinion linking him to the leopard print scarf found shortly after his arrest. Appellant presents two theories in support of his claim. First, he claims the "chain of custody" was compromised when the police officers placed all of the clothes recovered from the estate and from Appellant into a single bag, then hung the items in a garage to dry. Appellant's Brief at 34. Second, he contends that the expert's testimony and conclusion that there was a one in over one trillion, two hundred and forty-nine billion chance that a random African American could have contributed to the DNA on the scarf did not reflect generally accepted methods. Specifically, Appellant assails the expert's use of a spreadsheet to calculate the probabilities. *Id.* at 35.

We preliminarily note that although Appellant objected based on the "chain of custody" at trial, he did not preserve this challenge in his initial or supplemental Pa.R.A.P. 1925(b) statement. Therefore, this claim is waived. *See* Pa.R.A.P. 1925(b)(4)(vii); *Commonwealth v. Elia*, 83 A.3d 254, 263 (Pa. Super. 2013). Moreover, although Appellant cross-examined the forensic biologist regarding her methods to calculate the probability that a person would match the sample, Appellant did not object or move to strike

the expert opinion on that basis. Thus, this claim is also waived. *See* Pa.R.A.P. 302(a).

Appellant next argues that the trial court erred in not merging two counts of robbery—fear of serious bodily injury into the single count of robbery—demanding money from a financial institution. Appellant asserts that the robbery of the bank was the principal offense and the two counts of robbery—fear of serious bodily injury against the tellers were constituent offenses. He emphasizes that he only took the bank's property, the tellers were agents of the bank, and he did not take the tellers' personal property. According to Appellant, "It cannot be a robbery from a bank and a person at the same time unless the acts committed against each are separable." Appellant's Brief at 43. In sum, he claims because his "behaviors were all directed toward bank funds" he cannot be found guilty of, or sentenced separately for, threatening the tellers. *Id.* at 45-46. We disagree.

"A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence. Therefore, our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Quintua***, 56 A.3d 399, 400 (Pa. Super. 2012) (citations omitted).

Section 9765 of the Judicial Code states:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

A proper merger analysis under Section 9765 requires consideration of two factors: (1) whether the crimes arise from a single criminal act, and (2) whether the elements of one offense are included in the other offenses. *Commonwealth v. Pettersen*, 49 A.3d 903, 911 (Pa. Super. 2012).

> When considering whether there is a single criminal act or multiple criminal acts, the question is not "whether there was a 'break in the chain' of criminal activity." This issue is whether "the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime, then the actor will be guilty of multiple crimes which do not merge for sentencing purposes."

*Id.* at 912. (citations omitted).

Additionally, the Pennsylvania Supreme Court has cautioned:

> [W]hile Section 9765 indeed focuses on an examination of "statutory elements," we cannot ignore the simple legislative reality that individual criminal statutes often overlap, and proscribe in the alternative several different categories of conduct under a single banner. Consequently, in such cases, we caution that trial courts must take care to determine which particular "offenses," i.e. violations of law, are at issue in a particular case.

*Commonwealth v. Baldwin*, 985 A.2d 830, 837 n.6 (Pa. 2009). Offenses under different subsections of the same statute need not merge. *See Commonwealth v. Rhoades*, 8 A.32 912, 918 (Pa. Super. 2010) (holding subsections (1) and (4) of 18 Pa.C.S. § 2702 did not merge because they did not share identical statutory elements).

Section 3701 of the Crimes Code defines robbery, in relevant part, as follows:

> (1) A person is guilty of robbery if, in the course of committing a theft, he:
>
> ***
>
> (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury; [or]
>
> ***
>
> (vi) takes or removes the money of a financial institution without the permission of the financial institution by making a demand of an employee of the financial institution orally or in writing with the intent to deprive the financial institution thereof.

18 Pa.C.S. § 3701(a)(1)(ii), (vi). Robbery—fear of serious bodily injury is a felony of the first degree, and robbery—demanding money from a financial institution is a felony of the second degree. 18 Pa.C.S. § 3701(b)(1).

This Court has held that an overarching robbery from an enterprise does not require merger of sentences for threatening multiple employees of the enterprise. *Commonwealth v. Rozplochi*, 561 A.2d 25, 30 (Pa. Super. 1989) ("We hold that where a defendant threatens to inflict serious bodily injury on two employees in order to effectuate a theft of property from their common employer, the defendant may be convicted of two counts of robbery."). Moreover, in *Commonwealth v. Jannett*, 58 A.3d 818 (Pa. Super. 2012), this Court addressed a related claim regarding the propriety of

- 22 -

charges of robbery—fear of serious bodily when the principal act also constituted a robbery—demanding money from a financial institution.

> [The a]ppellant argues that his crime should fall under Section 3701(a)(1)(vi) because that Section "mirrors the circumstances of the bank robberies committed by the [a]ppellant." We disagree. While [the a]ppellant is correct that his crimes may also satisfy the elements of Section 3701(a)(1)(vi), he offers no support for his assertion that if a defendant could be prosecuted under multiple subsections, that the defendant is entitled to proceed under a lesser charge or the subsection that "most closely aligns" with his crime.
>
> The Legislature recently added Section 3701(a)(1)(vi) to the robbery statute, effective May 15, 2010. This created a lesser included offense; however, the Legislature did not amend or delete the previous forms of robbery, including Section 3701(a)(1)(ii). . . .
>
> ***
>
> [T]he Legislature could not have intended to create a disparity in the severity of the crime based on the type of establishment robbed.
>
> ***
>
> [T]he addition of Section 3701(a)(1)(vi) does not "revise[ ] the whole subject matter of" the robbery statute, as the Legislature merely added an additional subsection. . . . [T]he two subsections of the robbery statute are not inconsistent with one another. The two subsections are comprised of different elements. Section 3701(a)(1)(ii) requires that, to be convicted, an individual must have "threaten[ed] another with or intentionally put[ ] him in fear of immediate serious bodily injury." In contrast, Section 3701(a)(1)(vi) does not require any threat or fear of serious bodily injury; rather, the robbery must take place at a financial institution. Thus, the subsections have distinct aims and are not inconsistent with one another.

*Jannett*, 58 A.3d at 820-21 (citations and footnote omitted).

Although Appellant attempts to frame the relevant "act" as a singular episode involving the theft of money of a financial institution, the record belies his contention. Appellant committed robbery—demanding money from a financial institution by making a demand and taking the bank's money with the requisite intent. **See** 18 Pa.C.S. § 3701(a)(1)(vi). That Appellant pointed his weapon at McHone and pressed it into her side, while Appellant's codefendant pointed his weapon at Gresko, exceeded the bare elements of robbery—demanding money from a financial institution. **See** **Pettersen**, 49 A.3d at 912. Those additional acts established Appellant's liability for the two counts of robbery—fear of serious bodily injury. **See id.**; 18 Pa.C.S. § 3701(a)(1)(ii). Moreover, our review reveals that each of the offenses has an element the other does not, *i.e.*, a threat that places another in fear of serious bodily injury, and a taking of money from a financial institution. **See** 18 Pa.C.S. § 3701(a)(1)(ii), (vi); **Jannett**, 58 A.3d at 820-21. Thus, we discern no error in the trial court's decision not to merge the counts of (a)(1)(ii) and (a)(1)(vi).[6]

Appellant's final two questions challenge the discretionary aspects of the trial court's sentence. Appellant argues the trial court erred in applying

---

[6] In any event, Appellant's argument that the two felony-one counts of robbery—fear of serious bodily injury should have merged into the felony-two count of robbery—demanding money from a financial institution is contradicted by the plain language of Section 9765 which requires merger of a lower graded offense into a higher graded offense. **See** 42 Pa.C.S. § 9765.

the deadly weapon enhancement of the Sentencing Guidelines.[7]   Appellant's

Brief at 39.  He contends that (1) there was insufficient proof that he used

an operable firearm, (2) the Commonwealth's failure to charge him with a

"gun charge" invalidates the application of the enhancement, and (3) it was

improper to apply the enhancement to multiple counts.  *Id.* at 39-40.

Appellant next argues that the trial court impermissibly punished him for his

political beliefs as a sovereign citizen and imposed an aggregate sentence

that was disproportionate to his role in the crimes.  We find Appellant's first

argument is waived and his second argument merits no relief.

This Court has stated that

> discretionary aspects of [an appellant's] sentence [ ] are
> not appealable as of right.   Rather, an appellant
> challenging the sentencing court's discretion must invoke
> this Court's jurisdiction by satisfying a four-part test.
>
> We conduct a four-part analysis to determine: (1)
> whether appellant has filed a timely notice of appeal,
> *see* Pa.R.A.P. 902 and 903; (2) whether the issue
> was properly preserved at sentencing or in a motion
> to reconsider and modify sentence, *see* Pa.R.Crim.P.
> 720; (3) whether appellant's brief has a fatal defect,
> Pa.R.A.P. 2119(f); and (4) whether there is a
> substantial question that the sentence appealed from
> is not appropriate under the Sentencing Code, 42
> Pa.C.S.A. § 9781(b).

---

[7]  We acknowledge that Appellant asserts a claim regarding the proper application of the deadly weapon enhancement sounds in the legality of sentence.  However, for the reasons discussed below, we conclude that claims regarding the use of the deadly weapons enhancement go to the discretionary aspects of the sentence.

***Commonwealth v. Leatherby***, 116 A.3d 73, 83 (Pa. Super. 2015) (some citations omitted).  Moreover, it is well settled that a defendant has "no right to file a *pro se* motion" when he is represented by counsel.  ***See Commonwealth v. Nischan***, 928 A.2d 349, 355 (Pa. Super. 2007) (citation omitted).

Preliminarily, we note that "[a] legal question is distinct from [the] legality of sentence."  ***Commonwealth v. Archer***, 722 A.2d 203, 209 (Pa. Super. 1998).  A "misapplication of the Sentencing Guidelines constitutes a challenge to the discretionary aspects of sentence."  ***Id.***  Thus, this Court has regarded challenges to the application of the deadly weapon enhancement in the Sentencing Guidelines as challenges to the discretionary aspects of the sentence.  ***See Rhoades***, 8 A.3d at 916.  Accordingly, a challenge to the application of the enhancement cannot be appealed as a matter of right and is subject to waiver.  ***See Archer***, 722 A.2d at 210-11.

Instantly, Appellant did not object to the application of the deadly weapons enhancement at sentencing or in counsel's post-sentence motion. Although Appellant submitted a *pro se* motion challenging the deadly weapon enhancement, that motion bears a handwritten date of Sunday, April 5, 2015—four days after the trial court appointed counsel for the purposes of post-sentence proceedings, and two days after the court denied

counsel's post-sentence motion.[8]   Under these circumstances, we conclude that Appellant did not preserve his challenge to the application of the deadly weapon enhancement for appellate review.  **See Leatherby**, 116 A.3d at 83; **Nischan**, 928 A.2d at 355.

As to Appellant's final challenges to the excessiveness of the sentence, we note that Appellant preserved his arguments in counsel's post-sentence motions.   Moreover, Appellant included in his brief a Pa.R.A.P. 2119(f) statement summarizing his arguments.  The arguments that the trial court's sentence was disproportionate to his codefendants and that the court punished him based on his sovereign citizen beliefs raise substantial questions.  **See Leatherby**, 116 A.3d at 83.   Therefore, we consider these claims.

It is well settled that

> [s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion.  In this context, an abuse of discretion is not shown merely by an error in judgment.  Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

---

[8] Moreover, Appellant submitted a *pro se* notice of appeal before mailing the court his *pro se* post-sentence motion.  Therefore, even if Appellant could be considered *pro se* following the sentencing hearing, his *pro se* post-sentence motion was procedurally improper.

*Commonwealth v. Mastromarino*, 2 A.3d 581, 589 (Pa. Super. 2010) (citation omitted).

Following our review, we discern no basis to disturb the trial court's determination that it did not unreasonably sentence Appellant to a greater sentence than his codefendants. The court was apprised that Appellant did not have as extensive a prior record as his codefendants. *See* N.T., 3/26/15, at 61. The trial court explained that it fashioned its sentence based on the sophistication of the robbery and the particular harms Appellant caused McHone, as well as the vehicle chase that ensued after the robbery. *Id.* at 84-86, 90. The court further observed that Appellant displayed a lack of remorse, indicating that Appellant "snickered" when McHone testified at sentencing. *Id.* at 87. The court found Appellant to be a "manipulative defendant" and "a dangerous young man." *Id.* at 88. Therefore, we cannot conclude that the trial court lacked a reasoned basis to sentence Appellant more severely than his codefendants or that the court's sentence was disproportionate to Appellant's role in the robbery.

Lastly, we discern no basis in the record to conclude that the trial court impermissibly relied on Appellant's political beliefs when fashioning its sentence. Rather, the court carefully distinguished Appellant's political beliefs from his actions, the latter of which evinced a lack of remorse and a failure to take responsibility for criminal actions. Additionally, the court properly considered the gravity of the offenses, the impact on the

community, and Appellant's attempts to manipulate and disrupt the criminal justice system. Thus, Appellant's claims that the court's sentence was excessive warrant no relief.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/25/2017